IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 1:24-cr-65 |
| | ) | |
| v. | ) | The Honorable Rossie D. Alston, Jr. |
| | ) | |
| RUI JIANG, | ) | Sentencing: June 18, 2025 |
| | ) | |
| Defendant. | ) | |

**UNITED STATES' POSITION ON SENTENCING
AND MOTIONS FOR UPWARD DEPARTURE AND VARIANCE**

On Sunday morning, September 24, 2023, Rui Jiang arrived at the Park Valley Church armed with a semi-automatic firearm, fifty rounds of ammunition and multiple magazines, knives, and bear spray. He had the Prince William County Police Department radio playing in his ear. He had cased the entire church for hours the night before. And he had signed his Final Letter: in his own words leading up to that Sunday, he was there to watch men "bleed from their bullet holes," and the women he killed along the way would be "collateral damage." Only the swift actions of citizens and law enforcement alike stopped Jiang. His attempted mass shooting of congregants simply practicing their faith strikes at the heart of humanity and one of this country's fundamental rights: the right to worship free from obstruction, especially violence. And Jiang planned and attempted this shooting because, in his view, God rewarded others more than himself. As many of the congregants explained in their victim statements, Jiang turned their house of peace into one of constant worry. Only a significant sentence can adequately address this crime.

First, the government agrees with the calculation of the U.S. Sentencing Guidelines range, as calculated by the U.S. Probation Office. Accordingly, the defendant faces 135 to 168 months on Count 1, and then a 60-months consecutive term of imprisonment on Count 2. Second, the

evidence in this case overwhelmingly established that the defendant intended to kill not just one person but many people inside the Park Valley Church during his attack, creating a substantial risk of serious bodily injury and death to everyone who was attending church that morning. Accordingly, the government moves for a five-point upward departure pursuant to Application Note 2 of USSG §2A2.1, as well as an upward variance. The upward departure would result in a guideline range of 235-293 months.

Third, the government seeks an upward variance from 293 to 300 months' imprisonment on Count 1, pursuant to the factors enumerated in 18 U.S.S.C. § 3553(a). The defendant attempted a mass shooting at a house of worship and did everything but pull the trigger—an act he was prepared to do until others intervened. The government recommends a total sentence of thirty years in prison. This sentence includes 300 months of imprisonment on Count 1 and 60 months of imprisonment on Count 2, to run consecutive. The 60 months of imprisonment on Count 3 would run concurrently. This sentence would be sufficient but not greater than necessary to satisfy the goals of sentencing.

## I.    FACTUAL BACKGROUND

The facts in this case are deeply troubling and leave no doubt that a mass casualty incident was narrowly averted that morning. Much of the evidence introduced at trial came from the defendant's own writings and recordings. His writings showed that by August 2023, the defendant had begun to fixate his anger on God and, by extension, the Park Valley Church. In the days immediately before the attempted mass shooting at the Church, the defendant's internet activities, notes to self, and actions became almost singularly focused on preparing for his attack, including by explaining his actions in his manifesto.

At 1:17 AM on Friday, September 22, the defendant emailed one of the Church's pastors with the subject, "Please remove my membership," adding, "i am done with this bullshit. you made me your enemy. i gave your my heart, even after all you did to me. fuck all of you."[1]  At 1:24 AM, the defendant accessed his Gmail account and reviewed an email receipt documenting his June 16 donation to the Church of $452.75.  Soon after, the defendant emailed the Church demanding a refund of his donation, stating, "I had started a recurring donation of at least 10% of each paycheck. However, despite my relentless loyalty even in the worst of times, my life has only gotten WORSE."  After listing alleged unfortunate events in his life, the defendant ended, "Interestingly enough, my life was generally better, before this year, and before I started tithing.  I renounce my membership to the church and I DEMAND MY REFUND OF MY DONATION."

The next night, on September 23, the defendant sent himself a series of "notes to self" emails.  At 2:52AM, the defendant emailed himself: "Do my actions affect my neighbors? Yeah? Well their very existence affects mine.  That take up extra space by fucking the woman who could be fucking me instead.  If they didn't exist, God wouldn't have them around to grant them the gift of sex over me.  So fuck you and fuck my neighbors.  If they complain I have a gun, I will shoot through my walls.  Call the cops if you want.  I have no sex life, thus, what have I got to lose?"

The defendant then turned to Instagram.  Using the account name "Ray43386," the defendant posted at 3:27 AM a picture of crumpled pages ripped out of a Bible along with a video of those pages on fire in a cooking pan on the stove top, adding the caption, "Burning the Bible #fkGod #hatredOfGod."  Notably, the defendant "tagged"—or digitally linked his post to—the Church's own Instagram account.  At 3:34 AM, he posted a picture of the Bible itself, tagged the Church again, and wrote, "Put the Bible on the floor next to the bathroom.  Now every time I take

---

[1] All quotations are provided verbatim, to include any spelling or punctuation errors.

a piss, I have to step on it. #fkGod."  At trial, a witness testified that she saw that post, and she recognized that Bible, seized from the defendant's apartment, when she held it in her hands on the witness stand.  She knew it was a Bible that the Church had given the defendant, inscribed inside with the words, "You are loved."  In another note-to-self email, the defendant wrote at 4:04 AM, "All these other men who you blessed with regular sex lives… They owe you everything. Sex is the ONLY benchmark and proof I use to measure your love for me or anyone.  So I don't owe you shit. You lost me."  Forty minutes later, the defendant started messaging the Church again.  At about 4:41 AM, he attempted to send a text message to the main phone number affiliated with the Church, stating, "Shut the fuck up."  And, at 7:17 AM, he sent an email to an address affiliated with the Church: "Fuck all of you.  I hate you all.  Refund my money now.  You owe me."

By 10:58 AM on September 23, the Church was already actively trying to refund the defendant's money.  One of the senior pastors at the Church responded to the defendant offering to help him: "Dear Rui, I am so sorry for what you are going through.  We will refund your money immediately.  If there is anything else we can do we are available to help."  Within 30 minutes, the senior pastor emailed the defendant again with an update, explaining, "Just got off the phone with our financial director.  All of your money will be refunded back to your credit card on Monday.  I anticipate that by Tuesday everything should be clear.  I apologize for any inconvenience and know that we are here to help."

The defendant's plan to attack the Church was never about the tithing money.  Despite the refund, the defendant went to Sharp Shooters, a firearms store in Lorton, Virginia, practiced at their gun range, and purchased 50 fresh rounds of 9-millimeter ammunition.  That ammunition was loaded into the defendant's magazines when he arrived at the Church the next day.  At about 6:52 PM, the defendant used his cell phone to take a picture of a 9-millimeter, semi-automatic

4

firearm, three magazines (one of which was loaded), a box of 9-millimeter ammunition, a firearm case, a holster, ear protection, and a firing target. Five minutes later, he returned to Instagram and posted a photograph of his gloved hand holding the 9-millimeter firearm pointed at his television screen depicting a church and the text "Beautiful Old Churches Across America." The defendant added a message: "When a loyal and humble servant becomes God's worst enemy. When we've had enough. When my loyalty was never appreciated."

The defendant then began a series of internet searches on a variety of topics, further confirming his focus on carrying out an attack at the Church during services the next day. At 7:12 PM, he searched online for "Legal armor piercing rounds Virginia" and accessed a website related to "Widener's Guns, Ammo & Shooting Blog" about "Green Tip Ammo." According to the same link shown at trial—last updated on February 2021—"green tip ammo" is a "popular 5.56 cartridge [that] is also sometimes referred to as a 'penetrator round' due to its 62-grain projectile, partially steel core, and enhanced ability to punch through hard targets." Within two minutes, the defendant then searched online for "Latest church shooting," and accessed a news link titled, "Newark Police Seek Public's Help in Pastor's Shooting," detailing an August 24, 2023, shooting in which "bullets tore through the wall" of a pastor's residence and left him in critical condition.

Five minutes later, at 7:17 PM the defendant searched online for "Assault rifle buying process virginia wait period." His search led him to a series of sites that detailed "States That Impose a Waiting Period for Purchases of All Guns and Firearms," "Gun laws in Virginia," and "How Long Does It Take to Buy an AR-15 in the United States?" By 7:20 PM, the defendant went to the website for "Sharp Shooters," the firearm and ammo store he had purchased 9-millimeter ammunition from earlier in the day. Using Sharp Shooter's "gallery of guns" search feature, the defendant reviewed over thirty pages' worth of the store's rifle models and then called

Sharp Shooters and engaged in a phone call that lasted about one minute and fifty-five seconds. The defendant then drafted another series of "notes to self" from 7:45 PM to 7:56 PM, writing in relevant part:

> I am here to target men, and to deny them further the joys of a sexually active life that God blesses them with—the sex that God denied me. . . .

> Their deaths are blood on your hands. I am not here to kill women. Apologies in advance if women are killed as collateral damage. I am only targeting men, particularly men who are around enjoying life as part of a couple. It is highly advised that to not become a target, do not walk hand in and [sic] with their girlfriend or sexual partner—at least 6 feet distance.

> Any man who looks obviously lonely or probably haven't had sex in years—I will spare. But then again, in the heat of shooting, I might kill them anyways. Blood is on your hands. Not mine.

> Those lonely men who haven't had sex in years—I will be doing them a favor by killing them out of their misery. They will be begging to die anyways. Those men who are lucky enough to be gifted by God to be sexually active—I can't wait to watch them beg for one last kiss with their partner before I leave them to bleed from their bullet holes.

> Fuck you God. You did not allow me, yet another weekend, to have sexual activity. So I will deny your other servants their weekends.

> I HATE YOU.

Immediately after sending these notes to self, the defendant searched online for "what medication minimizing effects of bullet wound."  His search led him to a site titled, "How to Handle a Gunshot Wound—First Aid and Recovery for Bullet Wounds," that details "what to do and how to handle gunshot wounds in different parts of the body."  He continued researching how to address bullet wounds at 8:00 PM, searching "Ibuprofen and bullet wounds will it increase bleeding" online and accessing a Reuters article titled, "Some painkillers have more bleeding risk than others."

By 8:03 PM, the defendant turned his focus to silencers. He searched online for "silencers legal virginia," "silence are buying process wait period Virginia," and then accessed a site titled, "How Long Does It Take To Get A Suppressor 2024." Soon after researching silencers, the defendant accessed the Park Valley Church "Employee Directory" and began researching specific pastors at the Church, reviewing their name, church email address, social media activity, and past sermons online.

After midnight on Sunday morning, the defendant traveled to Park Valley Church with his car's dash camera recording him casing the Church's property. The defendant remained on the property for nearly one hour, driving around the parking lot, checking the Church's entrances and exits, taking pictures, circling around the Church's children center, and parking in numerous spots facing each of the building's exits and the parking lot exits from various vantage points. At certain spots throughout the Church property, the defendant stopped the car, exited, and walked around the property in the rain.

The defendant posted a series of photographs of different parts of the Church's entrances and exits and firearm-related material along with threats against the church and its congregants on Instagram in those early morning hours:

- At 2:45 AM, the defendant posted a picture he took that morning through his rain-soaked windshield of the front façade of the Church and messaged, in relevant part, "Blood will be on your hands."

- At 2:48 AM, the defendant posted a picture of part of the Church's parking lot and added, in relevant part, "I'm not going to let you enjoy your symbolic fuckery. When it all goes down: #bulletToTheHead blood is on your hands."

- At 2:52 AM, the defendant posted another picture taken through his windshield of the Church's front entrance (this time from a different vantage point) and wrote, in relevant part, "I am here to deny the men the life God actively puts so much effort to deny me every day.  No women will be harmed. To those down below: I am dropping this space suit and coming back after I am finished sending a message.  Blood will be on your hands.  This is how you repay me for my sacrifices.  I'm done."

- At 2:59 AM, the defendant posted a picture of the back entrance to the Church with the message, "Welcome to park valley church, attended by many top secret gov clearance holders in the area.  From this day forward, you will know that this is how you all repaid me.  Blood will be on your hands."

- At 3:20 AM, the defendant posted another photograph of the Church parking lot, writing, in relevant part, "This is not personal.  This is taking the lives that God denied me, the love that God blessed other men with.  You are indebted to me.  And this is how you repay me."

- At 3:26 AM, the defendant posted another picture near one of the Church's parking lot exits and added in relevant part, "You denied me the love life you allowed others to have. I sacrificed my ENTIRE LIFE serving your bull shit."

- At 4:42 AM, The defendant posted a picture of firearm target (that matches the target depicted in his earlier photograph he took at his residence) with at least seven bullet holes in it along with a message, stating, "I'm going to exterminate you, in this life and the next. For what you did to me, and for what you actively deny me.  So you better neutralize me when I respawn, bitch."

- Finally, at 5:14 AM, the defendant posted a picture of his hand pointing a semi-automatic handgun at a wall, messaging, "I sacrificed my entire 20s.  Alone.  As your political

assassin.  Never saw family.  Never knew what it was to be in love.  It was all I ever wanted.

And this is how the government repays me.  With torture.  With pain.  You brought this in

yourselves.  Blood will be on your hands.  The world will know my story.  And what you

did to me.  And why Im about to do what I do."

Upon returning home from his reconnaissance of the Church, the defendant spent nearly

an hour drafting what he entitled "the final letter (Sept 24, 2023)."  In relevant part, the defendant

wrote the following:

SEPTEMBER 24, 2023

My name is Rui Jiang. I was born [redacted] in [redacted], MD. . . .

When I lived the life of a homeless man on the streets, so that it was not seen as a
lie, so that my actions would not connect back to my employer – who paid me
nothing. Who else, but the most loyal and humble of servants, would subject
themselves to such sacrifices, all in the name of duty? What else do I have left to
prove? When I returned, I did not ask for the life of a rich or wealthy man.

All I expected, was a normal and modest life, with a loving relationship and a
routine sex life, just like the rest of you – luxuries you all enjoy every single day
and perhaps even take for granted. But even after all my sacrifices, even this was
denied to me. Despite my continued sacrifices in the name of duty, my quiet
donations to churches, God's community, praying on my knees every morning at
5am for an hour, thanking God in Jesus' name, despite my faith even in my worst
of days – nothing has changed. My mental health continues to deteriorate. I am not
allowed to be in love. To experience love. To experience a romantic relationship.
The Government routinely sends female operatives into my life, not with love or
sex or any intimacy, but strictly to test me continuously on whether I spill any
secrets, all in the name of duty. After all I put in, I have learned that the Government
WILL NOT take care of its most loyal and relentlessly committed operatives. Our
sacrifices teach us to always be selfish. Do NOT do your duty. Do NOT sacrifice.
It is NOT worth it. My loyalties – our loyalties – are not appreCIAted here.

What I am about to do, is not personal. It is not politically motivated (I am offduty
now). It is not religiously motivated. These people – soon to be victims – were not
targeted in advance. I did not, and perhaps will never know, their names, their faces,
their families, and what will become of the luxury of their romantic relationships I
am pulling them out of.

NO WOMEN WILL BE HARMED. I love and adore women. Without them, we become lunatics. So I apologize in advance, if any women are harmed, for that is deeply regrettable and collateral damage. I am here deny the love lives blessed by God to these lucky men, by taking out these men. And for those of you who believe in "past lives", I am simply resetting them so that they have to re-do everything again. I want them to know what it's like to be me – to labor through life yearning for that romantic love and never obtaining it, because God and the Government works so hard every day to sabotage the love lives for a select few, like me. To the families of those men about to be slain – I am sorry for what I have done and about to do. May your tears not be cried in vain, but celebrate how your loved ones had lived. For they are now with me, in the other world down below and high Heaven, and we will rise again just as we did in this life time. And perhaps, they shall return to find you again, just as I will, in the next lifetime. I hope you do not take this personally on me either. For whatever pain I cause, I hope to return in my next lifetime through philanthropy.

And to those few women who reciprocated my love, even for a few days: Thank you for those moments we shared, from the bottom of my heart. You know who you are. You prevented this from happening much sooner. I will repay you in my next life.

Until the next lifetime,

Rui

The defendant then posted a picture of part of this letter on Instagram at 6:03 AM, using the final paragraph as a caption for the post. He printed five copies of this letter, signed all five in wet ink, and left them on his apartment countertop, to be found by law enforcement after his attack.

The next morning, minutes before driving to the Church armed with his gun, fifty rounds of ammunition, bear spray, and knives, the defendant began searching online for all historical events that had occurred on September 24. The implication of his search is clear: he believed that soon his mass shooting at the Church would be added to that Wikipedia page. Next, the defendant began searching online for "haymarket va police radio" and, indeed, accessed the Google Play Store and searched for "Police Radio" applications. He then explored websites about various cyber-attack methods to shut down 911 dispatch services. His final searches show that he was still hoping to get a high-capacity semiautomatic rifle that morning before his intended attack. He

searched "Does dicks sell ar 15 rifles," and then accessed "Aardwolf Solutions," an Alexandria gun store. The evidence showed that while he wanted to inflict the maximum amount of damage he could, he was ready to carry out the attack that morning and was not willing to delay.

His final acts before driving to the Church left no doubt that he was intending to carry out an attack there. His last email, sent minutes before leaving his apartment, to one of the Church's pastors, had just a subject line that read, "The what, the why: May your tears be not in vain, but to celebrate their lives." And his dash camera footage from his car showed him accessing a police scanner application tuned to the Prince William County Police Department dispatch channel.

Through all this planning, the one thing the defendant did not seem to account for was the fact that the times of the Church's Sunday services had just changed on September 10th. Based on his calendar that listed the Church's first Sunday service at 9:00 AM, arriving at the Church just after 10:00 AM, the defendant would have expected over a thousand people milling about in the Church's atrium after the 9:00 AM service, surrounded by glass windows. Instead, when the defendant arrived, a 10:00 AM service had just gotten underway inside. While the defendant never wrote a step-by-step plan for how he intended to carry out his attack, this evidence indicates that the change in the service times explains why he did not begin his attack immediately upon arriving at the Church. Instead, the defendant entered the church, found a surprisingly empty lobby, and, once inside, had to reevaluate his plan. This change in service times was providential in that it created the opportunity for two things to happen: first, for Church congregants serving on the security team to observe and develop suspicions about the defendant's intentions inside the Church, and second, for Prince William County Police Lieutenant Shawn Peak, working off duty security in the Church's parking lot, to be alerted to the threat the defendant posed and confront him before the defendant had a chance to draw his gun and open fire.

As one of the security officers testified at trial, the defendant was interdicted by security and police at the entrance to the glass atrium, appearing to evaluate the glass windows. That atrium was about to fill up with congregants streaming out the congregation hall at the end of services. In that moment, the defendant was armed with two knives and sixteen rounds of 9mm ammunition. He had another 34 rounds of ammunition in his car, along with bear spray and two more knives. We can only speculate how many people he would have harmed had he been able to bring his plan to fruition, there is no doubt that he had the capacity, and the intent, to commit mass murder.

## II.    SENTENCING GUIDELINES AND MOTION FOR UPWARD DEPARTURE

U.S. Probation determined that the defendant's conviction on Count 1 implicates guidelines that address a defendant's intent to commit murder or attempted murder—specifically USSG § 2H1.1, which then cross-references to USSG § 2A2.1, and ultimately triggers a base offense level of 33. U.S. Probation Office Presentence Investigation Report ("PSR") DE 131 ¶ 75. The government agrees, and defense counsel did not dispute this determination in its objections to the Probation Office. PSR Addendum. Notably, however, USSG § 2A2.1 has no specific offense characteristic adjustment based on the *number* of victims or intended victims. *See* USSG § 2A2.1. In other words, this offense level applies when a defendant intends or attempts to murder just *one person*. The Sentencing Commission clearly recognized that fact and thereafter issued Application Note 2 authorizing the use of an upward departure if the defendant's actions "created a substantial risk of death or serious bodily injury to more than one person." Accordingly, if the Court finds that an aggravating circumstance exists—such as the sheer number of people that the defendant's actions created a substantial risk of real injury or death to—the Court should grant an upward departure pursuant to Comment 2 of USSG § 2A2.1. *See* USSG § 5K2.0(a)(1)(A).

The defendant's actions and own words make clear that he intended to kill many more than just one person.  On June 1, 2025, the government informed the U.S. Probation Office and defense counsel of its intention to seek an upward departure of up to five points pursuant to USSG §2A2.1 (Attempted Murder) Comment 2, which the U.S. Probation Office has recognized as a basis for departure in this case, PSR ¶¶ 130-31.  As the defendant's criminal conduct did, in fact, create a substantial risk of death and serious bodily injury to many people, the government hereby moves for a five-point upward departure, which would bring the defendant's total offense level to 38.

A court is authorized to depart from the Guidelines range when it finds that "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not absolutely taken into consideration by the Sentencing Commission."  18 U.S.C. § 3553(b)(1); *see also United States v. Grubbs,* 585 F.3d 793, 804 (4th Cir. 2009).  "In determining whether a circumstance was adequately taken into consideration, the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission."  *Id*. § 3553(b)(1).  Further, in "determining whether a peculiar circumstance in a case is an appropriate basis for departure, a sentencing court must determine whether that factor is encouraged, discouraged, unmentioned or forbidden."  *United States v. Musleh,* 106 Fed. Appx. 850, 857-58 (4th Cir. 2004) (citing *United States v. Rybicki*, 96 F.3d 754, 757 (4th Cir. 1996)).  When the factor in question is "encouraged," departure is "usually appropriate" unless "already adequately taken into account by the applicable guideline."  *Musleh*, 106 Fed. Appx. at 858 (quoting *Rybicki*, 96 F.3d at 757-58).

### a.  Comparison Cases

A five-point upward departure is both procedurally and substantively reasonable here and is consistent with enhancements applied in similar cases.  In *United States v. Harpham*, No. CR-11-0042-JLQ, 2011 U.S. Dist. LEXIS 148601 (E.D. Wash. Dec. 27, 2011), the defendant placed

an explosive device containing shrapnel coated with rat poison, an anti-coagulant substance, along the Martin Luther King, Jr. Day unity parade route in Spokane, Washington. *Id*. at 2. Thankfully the bomb was found and did not detonate, but the Court, based on the same upward departure provision applicable here, applied a five-point upward departure. *Id*. The Court reasoned, "[i]t was, and is, the conclusion of the court that had the explosive device not been found, and the parade route then changed, the Defendant, who was present among the thousand of participants, would have ignited the explosive device with the result being serious bodily injury, and probably death, to many men, women, and children." *Id*. at 5. Ultimately the defendant was sentenced to 32 years. *Id*. at 8.

Similarly, two defendants received three-point enhancements pursuant to this same guideline comment in *United States v. Carpenter*, 914 F.2d 1131 (9th Cir. 1990). There, the Ninth Circuit upheld a district court's sentence that involved an upward departure due to the risk to multiple victims. *Id*. at 1134-35. In that matter, the defendants hired two juveniles to kill one of the defendant's estranged wife and her three children. *Id*. at 1132. The hit men were supposed to blow up a butane tank adjacent to the trailer in which the wife and children lived, but the plan was thwarted. *Id*. The Ninth Circuit first noted that § 2A2.1 is predicated upon risk to a single victim, and found that it did not adequately take into consideration "the risk of harm to multiple victims - in this case, [the wife's] three innocent children, others on the road, or individuals in proximity to the trailer [when it was intended to explode]." *Id.* at 1134.

In *United States v. Bullis*, No. 5:95-CR-142-FL-1, 2023 U.S. Dist. LEXIS 34486, 2023 WL 2333871 (E.D.N.C. Mar. 2, 2023) (vacated and remanded on other grounds), a defendant's successful motion under 28 U.S.C. § 2255 brought the matter before the court for resentencing. *Id*. at 1. There, a defendant had mailed two separate pipe bombs to his wife's office during

business hours.  *Id*.  The first bomb went off and severed most of the wife's hand, causing serious lasting injuries, while scaring and traumatizing many nearby co-workers.  *Id*.  The second bomb was intercepted and diffused prior to detonation.  *Id*. at 2.  The defendant was convicted of various counts, to include two counts of mailing a pipe bomb with the intent to kill or injure another.  *Id*.  The government moved for an upward departure based on various sections, to include requesting a two-point enhancement per comment three[2] of USSG § 2A2.1 given that the two bombs – while only injuring one person – were intended to hurt and/or kill many more, and did, in fact, create a substantial risk of death and serious injury to many more.  *Id*. at 18.  While the government had sought 635 months' imprisonment (52 years), the court granted various upward departures and sentenced the defendant to 450 months' (37.5 years) imprisonment.  *Id*. at 22.

The Sixth Circuit affirmed a sentence that included a two-point upward departure based on the number of intended victims.  *See United States v. Pittman*, 55 F.3d 1136 (6th Cir. 1995).  In that matter, the defendant attempted to hire one hitman to kill two people.  *Id*. at 1138.  The defendant thereafter was convicted of one count of solicitation to commit murder and one count of using interstate commerce facilities in furtherance of commission of a murder for hire.  *Id*.  The district court looked to USSG §2A1.5 (Conspiracy or Solicitation to Commit Murder) and §2E1.4 (Use of Interstate Commerce Facilities in the Commission of Murder-For-Hire) which, unlike §2A2.1, does not have an explicit comment authorizing an upward departure.  *Compare* USSG §§2A1.5, 2E1.4 *with* 2A2.1.  The district court ruled that the guidelines did not take into account that the crime had more than one victim as the intended target.  *Id*. at 1139.  The court looked to

---

[2] What is currently comment 2 to USSG §2A2.1 was previously comment 3. Comments 1 and 2 were joined into comment 1 in 2004.  *See* Proposed Amendments to the 2004 Sentencing Guidelines at 112, *available at* *https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20040114_RFP_Amendments_0.pdf*.

Chapter 5 of the guidelines, which states that typically physical injury would not warrant a departure under the robbery guidelines since those guidelines have a specific adjustment based on the extent of injury. *Id*. at 1139 (citing to USSG § 5K2.0 comment 3(B)(ii)). The comment continues,"[h]owever, because the robbery guideline does not deal with injury to more than one victim, departure would be warranted if several persons were injured." *Id*. Despite the defendant's challenge to this upward departure, the Circuit affirmed the sentence, holding that the "language demonstrates the Sentencing Commission's awareness that victimization of multiple persons during the same criminal activity is not reflected in all offense levels and that this factor is an appropriate basis for departure." *Id*. at 1139. Ultimately the defendant was sentenced to 135 months' imprisonment. *Id*. at 1140.

Simply comparing these cases, the *Harpham* case is most on point, given that the pipe bomb created a risk of serious injury or death to many individuals, as is the case with the defendant's actions. Moreover, the cases cited above in which two or three-point enhancements were applied tend to lean toward cases in which two identifiable victims were clearly targeted, or a few more, but not crowds. *See also United States v. Canon*, No. 96-50048, No. 96-50052, 1997 U.S. App. LEXIS 19792 (9th Cir. July 29, 1997) (upholding a two-point upward departure under 2A2.1 cmt. 3 as the defendant shot, but missed, multiple times at two chasing officers). Accordingly, given the sheer number of intended and potential victims that the defendant had in mind, a five-point enhancement is justified.

### b. Methodology

Furthermore, several circuits, to include the Fourth Circuit, employ a methodology to gauge the reasonableness of a departure. Pursuant to that methodology, the government's request for a five-point enhancement is reasonable. According to this methodology, the "reasonableness

of a departure [based on multiple victims] may be evaluated by 'treating the aggravating factor as a separate crime and asking how the defendant would be treated if convicted of it.'" *Musleh,* 106 Fed. Appx. at 858 (quoting *United States v. Terry*, 142 F.3d 702, 707 (4th Cir. 1998)); *see also United States v. Kikumura*, 918 F.2d 1084, 1112 (3d Cir. 1990); *United States v. Ferra*, 900 F.2d 1057, 1062 (7th Cir. 1990); *United States v. Adelman*, 168 F.3d 84, 87 (2d Cir. 1999) (approving the use of the methodology of creating a hypothetical count for each victim to better assess a departure).

As an example, in *Pittman*, which was cited above, the defendant was convicted of hiring one hit man to kill two separate people. The court noted that had the defendant been convicted of two counts of hiring a hit man to kill one person, those convictions would have been excluded from grouping under USSG § 3D1.2(a), which would have resulted in a two-point increase to the defendant's adjusted offense level. *Pittman*, 55 F.3d at 1139-40. The court continued, "[w]e view the hypothetical as merely a methodology on which the district court relied to calculate the degree of departure, and we find the methodology to be a reasonable one." *Id*. at 1140. The court concluded, "The sentence imposed did not exceed the term Pittman could have received had he planned the two murders separately. We therefore conclude that the degree of the departure was reasonable." *Id*.

Therefore, "an upward departure should 'not exceed the sentence that would result under the Guidelines if [the defendant] actually had been convicted of [the conduct underlying the departure].'" *United States v. Terry*, 142 F.3d 702, 709 (4th Cir. 1998) (quoting *United States v. Melton*, 970 F.2d 1328, 1334 (4th Cir. 1992)) (alterations in original); *see also Kikumura*, 918 F.2d at 1112 ("It would throw the structure of the guidelines out of kilter to say that a defendant may receive more time on a departure than he could have received had he been convicted of the crimes

leading the judge to depart."); *United States v. Luscier*, 983 F.2d 1507, 1513-14 (9th Cir. 1993); *United States v. Herrera*, 70 F.3d 444, 446 (7th Cir. 1995). The maximum departure should equate to the maximum number of points that can be added to a guideline calculation under USSG §§ 3D1.1 through 3D1.5 – which amounts to five levels. This is because had the defendant been convicted of six separate attempted murder counts, or more, the ultimate impact on his offense level would be a five-point enhancement. *See* USSG § 3D1.4.

Under this methodology repeatedly endorsed by the Fourth Circuit, this Court should consider the number of victims the defendant was attempting to kill on the morning of September 24, 2023, at the Park Valley Church. And the defendant's own actions and words make that number clear – as many as possible. He intended to kill men, was willing to kill women as collateral damage, and he armed himself with fifty rounds of ammunition, knives, and bear spray. It cannot be that the defendant only faces the same offense level as if he had walked into Park Valley Church that morning intending to specifically target one person he disliked. Justice and the Guidelines require more. The potential number of victims that faced death that day is certainly more than six, the minimum necessary for the Court to apply a five-point departure here. Indeed, he had over a thousand available congregants let alone the law enforcement presence that would inevitably respond—something he knew as evidenced by the police radio he downloaded and listened to during his crime.

Critically, the standard is not merely how many people he intended to kill, but rather, whether he created a "substantial risk of death or serious bodily injury to more than one person." Had the defendant successfully begun his shooting spree, the chaos that would have erupted would have created a substantial risk of not just death or serious bodily injury by the defendant's shooting, but also due to potential accidental deaths from crossfire from police or armed civilians.

Additionally, there was a substantial risk of serious bodily injury to many people as hundreds, if not thousands, of worshippers could have been panicking trying to evacuate the Church sanctuary at the same time, through a few choke points. It takes no feat of imagination to recognize the sheer number of seriously injured or killed individuals that would have resulted by the defendant's own gun or otherwise. Accordingly, finding that this thwarted mass casualty incident created a substantial risk of serious bodily injury or death to at least six people, whether directly from the defendant's gun or the ensuing mayhem, wholly justifies a five-point enhancement.

Ultimately, courts may depart as long as it is reasonable, and the decision is "derived through principled methods" with an analytical reasoning behind the determination. *See Musleh*, 106 Fed. Appx. at 858. Here, the government offers similar cases as context and an accepted methodology in the Fourth Circuit to support its motion to upwardly depart five points. And the facts make abundantly clear that an upward departure is warranted—the fact of the matter is the guidelines provision governing a defendant's attempt to murder one person is woefully inadequate to capture the gravity of substantial harm the defendant intended to wreak on Park Valley Church. Therefore, the government respectfully requests that the Court make factual findings that the defendant created a substantial risk of serious bodily injury or death to at least six people, and grant its motion for a five-point departure pursuant to USSG §2A2.1, cmt. 2.

## III.    SECTION 3553(a) FACTORS AND MOTION FOR UPWARD VARIANCE

In addition to the requested departure, the government requests that the Court apply an upward variance pursuant to the 18 U.S.C. § 3553 factors, and also make findings that even if the guidelines range were miscalculated, an upward departure was erroneously granted, or any other procedural error occurred, that it would have imposed the same sentence pursuant to an upward variance. *See United States v. Hargrove*, 701 F.3d 156, 162 (4th Cir. 2012).

Accordingly, following the granting of the upward departure, the government requests an upward variance from the top of the guideline range of 293 months to 300 months. Furthermore, even if the Court were not inclined to grant the upward departure, or not grant the upward departure to the extent requested by the government, the government would, based on the reasons listed below, nevertheless move for an upward variance of the sentence under Count 1 to 300 months.

## IV.    LEGAL STANDARD

"A district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and" the 18 U.S.C. § 3553(a) factors "before imposing the sentence." *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). Thus, sentencing courts must consider the factors outlined in 18 U.S.C. § 3553(a), including the need for the sentence "to reflect the seriousness of the offense, to promote respect for law, and to provide just punishment for the offense; [and] to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(A), (B).

A district court "must articulate the reasons for the sentence imposed, particularly explaining any departure or variance from the sentencing range." *United States v. Hernandez-Villanueva*, 473 F.3d 118, 122 (4th Cir. 2007). In this, a court must make an "individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007). With relation to departures, if a court "decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree" of the departure. *Id*. "We find it uncontroversial that a major departure should be supported by a more significant justification than a minor one." *Id*. A reasoned explanation for the bases underlying the sentence being imposed also promotes the perception of a fair

sentencing and helps ensure that meaningful appellate review can occur. *United States v. Jackson*, 127 F.4th 448, 455 (4th Cir. 2025); *Musleh*, 106 Fed. Appx. at 858 (noting that any variance or departure requires analytical reasoning and a methodology).

As for variances, "[t]he explanation of a variance sentence must be tied to the factors set forth in § 3553(a) and must be accompanied by findings of fact as necessary." *Id*. at 122-23. Variant sentences are generally found to be reasonable if "the reasons justifying the variance are tied to § 3553(a) and are plausible." *United States v. Provance*, 944 F.3d 213, 219 (4th Cir. 2019); *cf. United States v. Davenport*, 445 F.3d 366, 372 (4th Cir. 2006) (holding that a sentence more than three times the top of the advisory sentencing range was unreasonable where the factors relied upon by the district court did not justify such a sentence and the court failed to explain how the variance served the § 3553(a) factors).

Ultimately, any sentence imposed, including departures and variances, is reviewed for reasonableness "under a deferential abuse-of-discretion standard." *Gall*, 552 U.S. at 41; *see also United States v. Evans*, 526 F.3d 155, 160 (4th Cir. 2008). The sentence must be both procedurally and substantively reasonable. *United States v.* Nance, 957 F.3d 204, 212 (4th Cir. 2020). Procedural error relates to the calculation of the guidelines, failing to consider sentencing factors, or failing to adequately explain a sentence. *Id*. Considering the substantive reasonableness, on the other hand, looks to the "totality of the circumstances" to determine "whether the sentencing court abused its discretion in concluding that the sentence it chose satisfied the standards set forth in § 3553(a)." *United States v. Mendoza-Mendoza*, 597 F.3d 212, 216 (4th Cir. 2010). Further, this standard applies whether a sentence is within, just outside, or significantly outside of the Guidelines range. *Gall*, 552 U.S. at 41; *see also Nance*, 957 F.3d at 215 (holding that even sentences that vary significantly from the Guidelines range are not deemed presumptively

unreasonable). Lastly, in reviewing a variant sentence, the Fourth Circuit "consider[s] whether the sentencing court acted reasonably both with respect to its decision to impose such a sentence and with respect to the extent of the divergence from the sentencing range." *United States v. Hernandez-Villanueva,* 473 F.3d 118, 123 (4th Cir. 2007).

## V.    ARGUMENT

The various sentencing factors all lean toward a crime that warrants a punishment near thirty years of imprisonment. The court "must determine whether a sentence within that [guidelines] range . . . serves the factors set forth in § 3553(a) and, if not, select a sentence that does serve those factors." *United States v. Green*, 436 F.3d 449, 456 (4th Cir. 2006). Here, nearly every 3553(a) factor favors an upward variance.

### i.    Nature of and Circumstances of the Offense

The nature and circumstances of the defendant's crimes alone justify an upward variance, and the Court should put tremendous weight on this factor. *See United States v. Fowler,* 948 F.3d 663, 672 (4th Cir. 2020) (noting that while one § 3553(a) factor may not be considered to the exclusion of others, it is entirely appropriate that one factor may outweigh the others); *see also United States v. Jeffery*, 631 F.3d 669, 679 (4th Cir. 2011) (noting that especially with regard to variant sentences, "district courts have extremely broad discretion when determining the weight to be given each of the § 3553(a) factors").

The nature and circumstances of this crime are severe and horrific, and go well beyond what is envisioned by the Guidelines, even with an upward departure pursuant to § 2A2.1, cmt. 2, which can only account for as many as six victims. The defendant intended every soul in the Park Valley Church that morning to be a victim of his attack, whether directly or indirectly. His writings make clear that he wanted their whole community to suffer. The defendant went to the Park Valley

Church at a time it was most packed with parishioners – over a thousand men, women, and children – to slaughter as many people as possible. The defendant, as seen by his own writings and manifesto, targeted happily married men but he recognized others would get caught in the crossfire. The defendant considered these people to be "collateral damage." In his manifesto, he also celebrated his victims' anticipated suffering and slow, painful deaths, writing "I can't wait to watch them beg for one last kiss with their partner before I leave them to bleed from their bullet holes." Separately he wrote, "[t]hey will be begging to die anyways." The defendant craved suffering.

This offense also was not a crime of passion or the result of uncontrolled impulse. Rather, the defendant methodically planned his attack. This was a calculated crime of revenge. As seen by the evidence presented at trial, in the month leading to the attempted shooting, the defendant became more fixated on his anger to God, men who had romantically-fulfilled lives, and the Park Valley Church. Quickly, his writings became more intense, more violent, more hate-filled, all leading to his plan to attack the Church and his creation of his manifesto. In the day prior to the attempted shooting, he researched other church shootings, the Church itself, and methods to make his shooting more violent and more unstoppable. He went to the gun store to buy 50 rounds of ammunition and practiced his aim at the firing range the day before. He posted his threats online and then drove to the Church in the early morning for recognizance purposes. He boasted about his intended actions through his postings, and even asked for forgiveness in his manifesto, demonstrating his clear understanding of the absolute evil of his actions. His manifesto also made clear his intention and knowledge that he would not survive the shooting, he had no desire to face any accountability for what he was about to do.

Another damning characteristic was the defendant's apparent desire to be remembered, to possibly even be held as a hero by some in our society for his violent plan. His research as to other Church shootings and into September 24, 2023, the day of his planned attack, and his prolific online postings and manifesto, show that he had a message to send. On Instagram he wrote, "[t]his is taking the lives that God denied me, the love that God blessed other men with. You are indebted to me. And this is how you repay me." He wanted to be remembered, he wanted the world to know his anger, his wanted his revenge to be marked in the annals of history. All this suggests he too may have wanted to be emulated.

Only due to intervention by a concerned citizen, by professional security and law enforcement, and with some luck was this mass casualty tragedy narrowly averted. The defendant aimed to rip families apart and reveled in that fact. The nature and circumstances of this offense are severe and warrant a variance to the same sentence as requested above.

### ii.    History and Characteristics of the Defendant

The defendant here had no justification for his actions. This was not a crime instigated by financial concerns in relation to tithing, for instance. Rather this was borne of frustration, vengeance, and a desire to make other people hurt, like him. It was as selfish as it was cruel.

To be sure, the defendant had no criminal history prior this incident. *See* PSR ¶¶ 89-93. He additionally had some struggles growing up, and suffers from mental health concerns. These mental health struggles became apparent as the parties were gearing up for trial. Nevertheless, these mental health concerns while admittedly mitigating, should not be given great weight. This is because the defendant never appeared to seek out assistance or help with his mental health, but rather let it fester. The defendant had the financial resources to seek assistance but did not. It also appears that those in his close orbit had encouraged him to seek out assistance.

Defense may also argue that the defendant had no control over his actions or that his mental health concerns were so overwhelming as to mitigate his guilt.  They are wrong.  This defendant knew he had impulse and anger control issues, but chose day after day to let it go untreated.  For instance, on September 2, 2023, he emailed himself, "Why can't you just control yourself when depressed?"  He responded, "Self control during this kind of depression and anger episodes is extremely difficult to maintain.  The fact that I am still alive and not in jail, or shot by cops or a thug, is evidence of attempted self control, and if you really understood and knew how difficult it was, how miserable it was, and how ultimately mentally strong I must be to not suffer those catastrophic consequences in the face of this level of misery and pain, you would understand that I am already exercising self control."  PSR ¶ 63.  What we see through his prolific writings is that he was rationale – he understood and was even concerned about the potential consequences of his anger, lack of impulse control, and mental health, but chose to do nothing to help himself.  He was not overcome by mental health concerns, but, rather, due to his various grievances and the condition of his life, he made a rationale decision that revenge, murder, and his own likely death was his way forward.

This defendant also had many opportunities in life.  He was able to get a higher education and be gainfully employed.  *See* PSR ¶¶ 116-125.  He never suffered from any alcohol or drug abuse issues, PSR ¶ 115, and did not grow up in a criminal household.  Therefore, the only potential mitigating evidence would be his mental health, but any mitigating value would be minimal.  Further, as long as the Court speaks to this mental health concern during sentencing, it is free to entirely disregard any claim of mitigation or give it little weight.  *See United States v. Johnson*, No. 21-4357, 2024 U.S. App. LEXIS 2010 *, 2024 WL 339343, at 10-12 (4th Cir. 2024 Jan. 30, 2024).  That said, the government does believe that any sentence imposed must recognize this

mental health history and seek to provide the defendant with needed correctional treatment and medical treatment, and should likely set any incarceration at a Federal Medical Center.

### iii.    Other Factors To Be Considered Under 18 U.S.C. § 3553(a)

As noted above, the Guideline provision which applies in this matter contemplates only the attempted murder of a single individual. Therefore, in order for the ultimate sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment, the sentence should reflect that the defendant intended to commit a mass casualty hate crime. The public must be on notice that if you attempt a mass casualty event, especially at what is supposed to be a center of worship for families, that you will be punished severely. The attempted murders here were not justified by perhaps some prior bitter feuds or wrongs, but rather were to be perpetuated against those who sought a peaceful place to worship and be in communion with friends and family. Ultimately, that the defendant was fortuitously stopped – not that he gave up – should not benefit this defendant.

Additionally, an upward variance or departure is further justified by the likelihood of recidivism by the defendant. It is important to note that the defendant remained defiant during the trial, speaking at times as to his lack of guilt, even following the reading of the verdict form by the foreperson. His desire to be recognized following the atrocity by researching the date of the incident as well as other Church shootings, his online, public threats and penning of a manifesto in which he proclaimed to the world his intentions and reasons, and his desire for revenge suggest a higher likelihood that he may attempt to harm others once released. This desire for notoriety also means that a substantial period of incarceration is required to help deter others in the public from choosing criminality to send a message. Due to the fact he may be older upon release does

not mean he will be less dangerous in and of itself.[3]  Further, his impending period of incarceration will assuredly deny him the one thing he was willing to kill over – a successful relationship and healthy sex life with a woman.  This fact may only serve to build greater anger within the defendant.  This strong likelihood of recidivism and future danger to the community also support the variant sentence requested by the government.  *See, e.g., United States v. Washington,* 743 F.3d 938, 944-45 (4th Cir. 2014) (upholding a variant sentence to 240 months, where guidelines range was 135 to 168 months' imprisonment, based upon the district court's recorded finding that the guideline sentence would not provide adequate deterrence or protection to the public).

## VI.    VICTIM IMPACT

As part of its responsibility to the Park Valley Church community under the Crime Victim Rights' Act, the government hosted a presentation at the Church at which it explained the facts of the case, the trial, potential sentencing outcomes, and the community's rights as a victim pursuant to the law.  To further the involvement of victims in this process, the government provided the Church community with a sample Victim Impact Statement form.  The government is now in possession of various responses, which are attached as Exhibit 1.  Due to victim concerns about potential retaliation or retribution, the government has redacted the names and other personal identifying information of all victims.  These statements provide a firsthand account of how this

---

[3] The government submits a few examples of older male mass shooters. For instance, Wenwei Chou (70 yo): accused (and captured on video and at the scene by congregants) for shooting and killing 1 congregant and wounding 5 others at the Irvine Taiwanese Presbyterian Church; charges pending. Huu Can Tran (72 yo): shooter at Monterey Park who killed 11; committed suicide (https://www.cnn.com/2023/01/24/us/monterey-park-california-mass-shooting-tuesday/index.html). Frazier Glenn Miller: white supremacist (73 at the time of the shooting) who was convicted of 2 shootings on the same day in 2014 at a JCC in Overland KS, resulting in the deaths of 3 people.

tightknit community was impacted, and why a serious term of imprisonment – one well above the current Guidelines range – is warranted, justified, and necessary.

The government would further advise the Court that a few parishioners have requested the ability to address the Court personally during the sentencing hearing. The government anticipates this taking no more than thirty minutes with all speakers.

## VII.    FORFEITURE

The government further notes that the government has noticed the defendant since his Indictment of its intent to forfeit (a) a Walther Model PPS M2 LE Edition 9mm semi-automatic firearm, bearing serial number AO8670; (b) three loaded magazines; and (c) 26 rounds of 9mm ammunition. The Court heard evidence during the trial as to how each of these items were involved in and facilitated the defendant's crime of conviction. Following the jury trial, the government submitted a waiver signed by the defendant in which he waived his right to have the jury hear evidence as to forfeiture, and instead, left this question to the Court. *See* Waiver of Forfeiture Determination by Jury DE 127. The government has submitted a consent order of forfeiture to defense counsel and is awaiting word on whether the defendant will sign it. If he elects not to do so, the government will file a motion for a preliminary order of forfeiture and request that the Court make factual findings as to the nexus between the crimes of conviction and the items sought to be forfeited. Lastly, the government here does not seek restitution against the defendant, nor any fine.

## VIII.    SUPERVISED RELEASE AND CONDITIONS OF RELEASE

The government further submits that a lengthy term of supervised release will be necessary to help the defendant adjust to life post-imprisonment. For that reason, the government requests the maximum term of supervised release, which is five years for Counts 1 and Counts 2, and three years for Count 3, all to run concurrently. Following a likely lengthy term of imprisonment, the

defendant will undoubtedly find it hard adjusting to a life without much of a support system. His inability to adjust appropriately, identify and seek out support, maintain healthy relationships, and proactively deal with negative emotions in a healthy manner all helped lead him to criminal behavior. Therefore, given these factors and his mental health concerns, in addition to the incredible stressors he will face upon release, the defendant will absolutely need the guidance and watchful eye of the U.S. Probation Office as he reintegrates. Lastly, given the nature of this offense, the government agrees with, and joins, the request by the Probation Office for five special conditions of supervision following his release from prison. *See* PSR pg. 34-35.

## IX.    CONCLUSION

This is a disturbing case that deserves a weighty sentence. But for luck and the intervention of various good Samaritans, a mass casualty event would have rocked this District back in September of 2023, forever changing the lives of thousands of community members. The defendant's attempt was enough to deeply impact members of the community, as made clear by the victim impact statements the Government provided. Based on all the factors set forth in 18 U.S.C. § 3553(a), and the requested upward departure and variance, the government submits that a sentence of 300 months of imprisonment on Count 1; 60 months of imprisonment on Count 2, to run consecutively; and 60 months of incarceration on Count 3 to run concurrently, is sufficient but not greater than necessary to satisfy the goals of federal sentencing.

Respectfully submitted,

Erik S. Siebert
United States Attorney

Date:  June 13, 2025                    By:  _____/s/_____

Nicholas A. Durham
Troy A. Edwards, Jr.
Assistant United States Attorneys
NY Bar No. 4712741
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314
nicholas.durham@usdoj.gov
(O) (703) 299-3758
(F) (703) 299-3980


Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division

By:  _____/s/_____

Kyle Boynton
Trial Attorney
Criminal Section
Virginia Bar No. 92123
150 M St. NE
Washington, DC 20530
Tel. 202-598-0449

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 13, 2025, I filed the foregoing with the Office of the Clerk of Court electronically using the CM/ECF system, which will automatically send a notification of such filing to all counsel of record.


                                    /s/
                                    _____
                                    Nicholas A. Durham
                                    Assistant United States Attorney